## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

IDREES WEATHERS,          :
      Plaintiff          :     CIVIL ACTION NO. 3:13-CV-2069
                        :     (Judge Nealon)
      v.               :
                        :
MARK BAKER, ET AL.,       :
      Defendants     :

## MEMORANDUM

Idrees Weathers, an inmate who is confined at State Correctional Institution, Huntingdon, Pennsylvania, ("SCI-Huntingdon") filed the above-captioned pro se action pursuant to 42 U.S.C. § 1983. (Doc. 1). The action proceeds on an amended complaint, which names the following Defendants: Mark Baker, D.O., Wexford Clinical Director for SCI-Huntingdon; Traci Parkes, Health Care Administrator at SCI-Huntingdon; Tabb Bickell, Superintendent of SCI-Huntingdon; Paula Price, Health Care Administrator of SCI-Huntingdon; Trevor Wingard, Superintendent of State Correctional Institution, Laurel Highlands, Somerset, Pennsylvania, ("SCI-Laurel Highlands"); Annette Kowalewski, Health Care Administrator at SCI-Laurel Highlands; Marjorie Lechene, Registered Nurse Supervisor at SCI-Laurel Highlands; and Roger Mason, Physical Therapist at SCI-Laurel Highlands. (Doc. 17). On September 24, 2014, Defendants Bickell, Kowalewski, Lechene, Price, Wingard, and Mason were dismissed, leaving

Defendants Baker and Parkes as the only remaining Defendants. (Docs. 47-48).

Presently ripe for disposition is Defendants Baker and Parkes' motion for

summary judgment. (Doc. 56). For the reasons set forth below, the motion will be

granted.

## I.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 states that "[t]he court shall grant

summary judgment if the movant shows there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." FED. R.

CIV. P. 56(a). "A factual dispute is material if it might affect the outcome of the

suit under governing law." Lupan v. Corinthian Colls. Inc., 761 F.3d 314, 317 (3d

Cir. 2014) (citing Doe v. Luzerne Cnty., 660 F.3d 169, 175 (3d Cir. 2011)). "A

factual dispute is 'genuine' only if there is a sufficient evidentiary basis that would

allow a reasonable fact-finder to return a verdict for the nonmoving party."

Mitchell v. Dodrill, 696 F. Supp. 2d 454, 462 (M.D. Pa. 2010) (Rambo, J.) (citing

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). The court "must

view all evidence and draw all inferences in the light most favorable to the non-

moving party," and summary judgment will be granted only if "no reasonable juror

could find for the non-movant." Lawrence v. City of Philadelphia, 527 F.3d 299,

310 (3d Cir. 2008).

"At summary judgment the moving party must identify evidence that demonstrates an absence of a genuine issue of material fact." Rivera v. Rendell, 2015 U.S. Dist. LEXIS 125542, at *4 (M.D. Pa. Sept. 21, 2015) (Caputo, J.) (citing Budhun v. Reading Hosp. and Med. Cntr., 765 F.3d 245, 251 (3d Cir. 2014)). The moving party must support his motion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A). "With respect to an issue on which the nonmoving party bears the burden of proof, the moving party may discharge that burden by showing that the nonmoving party 'failed to make a sufficient showing to establish the existence of an element essential' to that party's case." Thomas v. Lawler, 2015 U.S. Dist. LEXIS 126135, at *3 (M.D. Pa. Sept. 22, 2015) (Caldwell, J.) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).

In responding to a motion for summary judgment, "[t]he non-moving party cannot rest on mere pleadings or allegations; rather it must point to actual evidence in the record on which a jury could decide an issue of fact its way." El v. Southeastern Pa. Trans. Auth., 479 F.3d 232, 238 (3d Cir. 2007) (citing Berckeley Inv. Grp., Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006)). Said differently, the

3

non-movant "must set forth specific facts showing that there is a genuine issue for trial." Saldana v. Kmart Corp., 260 F.3d 228, 231-32 (3d Cir. 2001). The nonmoving party can also survive a motion for summary judgment by "'showing that the materials [that the moving party has cited] do not establish the absence . . . of a genuine dispute." Thomas, 2015 U.S. Dist. LEXIS 126135, at *4 (quoting Fed. R. Civ. P. 56(c)(1)(B)).

"The Middle District of Pennsylvania's Local Rules require a party seeking summary judgment to file 'a separate, short and concise statement of material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried.'" Thomas, 2015 U.S. Dist. LEXIS 126135, at *4 (quoting Pa. M.D. L.R. 56.1). Local Rule 56.1 also states that the non-moving party's opposition to the motion for summary judgment shall include:

> a separate, short and concise statement of the material facts, responding to the numbered paragraphs set forth in the statement [of material facts filed by the moving party], as to which it is contended that there exists a genuine issue to be tried. Statements of material facts in support of, or in opposition to, a motion shall include references to the parts of the record that support the statements. All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party.

Pa. M.D. L.R. 56.1; see also Fed. R. Civ. P. 56(e)(2) (if a party fails to properly

support an assertion of fact, or address an another party's assertion of fact, the

court may consider the fact undisputed for the purposes of the motion). "While

parties acting pro se are given leeway in certain requirements, they are not excused

from complying with court orders and the local rules of court." Sanders v. Beard,

2015 U.S. Dist. LEXIS 72657, at *15 (M.D. Pa. 2010) (Caputo, J.). "Further, the

purpose of the factual statements required by Local Rule 56.1 is not insignificant."

Soler v. Fernandez, 2015 U.S. Dist. LEXIS 130642, at *6-7 (M.D. Pa. Sept. 29,

2015). Statements required by Local Rule 56.1:

> are not merely superfluous abstracts of the evidence. Rather,
> they are intended to alert the court to precisely what factual
> questions are in dispute and point the court to the specific
> evidence in the record that supports a party's position on each
> of these questions. They are, in short, roadmaps, and without
> them the court should not have to proceed further, regardless of
> how readily it might be able to distill the relevant information
> from the record on its own.

Id. at *7 (quoting Loften v. Diolosa, 2014 U.S. Dist. LEXIS 32345, at *12 (M.D.

Pa. 2014)).

## II.   STATEMENT OF MATERIAL FACTS

The following facts are undisputed unless otherwise indicated, and are taken

from the Defendants' Statement of Material Facts, Plaintiff's response thereto, and

supporting documentation of record, and are viewed in the light most favorable to

the nonmoving party.[1]

On March 14, 2012, Plaintiff suffered a patellar tendon tear in his left knee. (Doc. 57, pp. 179-80). On March 24, 2012, Plaintiff underwent a left patellar tendon repair. (Id. at pp. 89-90, 124, 177-78). The surgery was performed by Dr. Stauff at Mt. Nittany Medical Center. (Id.). Plaintiff was released from the Medical Center with instructions that he be partial weight bearing and use an immobilizing brace on his left knee at all times. (Id. at p. 90). Plaintiff was also instructed to call in fourteen days (14) for a follow up appointment. (Id.).

Plaintiff returned to SCI-Huntingdon on March 24, 2012, and was placed in the infirmary. (Id. at p. 177). On March 26, 2012, Plaintiff was referred to Health South for a physical therapy consultation. (Id. at p. 87).

On March 28, 2012, Plaintiff's left knee was examined by Harry Poland, PA-C. (Id. at p. 173). Plaintiff's wound and sutures were intact, and he had no

---

[1] Although Plaintiff filed a "Statement of Disputed Factual Issues," (Doc. 61), a "Declaration in Opposition to Defendants' Motion for Summary Judgment," (Doc. 60), and a "Declaration in Opposition to Defendants' Reply Brief in Support of Motion for Summary Judgment," (Doc. 62), these filings do not comply with the requirements of Local Rule 56.1. While Plaintiff's "Statement of Disputed Factual Issues" generally denies some of the facts set forth in the Defendants' statement of facts, he does not cite to evidence in the record to demonstrate that those facts are genuinely disputed. Consequently, the facts set forth by the Defendants in their Statement of Material Facts will be admitted unless properly controverted by Plaintiff's evidentiary materials. See M.D. Pa. L.R. 56.1 and FED. R. CIV. P. 56(c)(3).

complaints.  (Doc. 57, p. 173).  On March 30, 2012, Plaintiff reported that he was ready to "go back," and thus, he was placed back in his regular housing assignment.  (Id. at pp. 173-74).  On that same date, Plaintiff was issued crutches and a knee immobilizer.  (Id. at pp. 174, 224).

On April 2, 2012, Health South completed its initial plan for care and physical therapy, which instructed Plaintiff to use hot and cold modalities, perform therapeutic exercise, neuromuscular re-education, progressive gait training and progressive home program three (3) times per week for four (4) weeks.  (Id. at p. 88).  On April 5, 2012, Plaintiff's sutures were removed.  (Id. at p. 122).  On April 12, 2012, Plaintiff was given a knee brace and an order for a physical therapy evaluation and treatment.  (Id. at p. 223).

On April 15, 2012, Plaintiff was evaluated for physical therapy at SCI-Huntingdon.  (Id. at p. 84).  On April 16, 2012, Plaintiff's evaluation was discontinued because he was transferred to SCI-Laurel Highlands for physical therapy.  (Id. at pp. 20, 170).

On April 17, 2012, Plaintiff began his physical therapy at SCI-Laurel Highlands.  (Id. at p. 167).  His regimen included motion and strengthening exercises two (2) to three (3) times per week.  (Id. at pp. 184-88, 192, 195).  On April 24, 2012, Plaintiff was permitted to go to the yard, church, and library.  (Id.

at p. 118).

On April 25, 2012, he was admitted to the "PCU" with self medication of Motrin, a hinged knee brace, and crutches. (Doc. 57, pp. 118, 159). Plaintiff was admitted with specific limitations. (Id. at p. 118). On that same date, Plaintiff was observed ambulating about with the assistance of crutches. (Id. at p. 159). He was found to be stable, partial weight bearing on his left lower extremity, and had a steady gait. (Id.). It was noted that his left knee incision was well healed. (Id.). Plaintiff also reported adequate pain management. (Id.). Plaintiff was to continue with current plan of care and to be monitored. (Id.).

On May 1, 2012, Plaintiff stated that he was not getting his "items" from his other "jail," and that he would rather be sent back and stop his physical therapy. (Id.). Plaintiff was given option to sign-off if he was not satisfied with his treatment. (Id.).

On May 8, 2012, Plaintiff was seen by R.D. Mason, PT. (Id. at p. 160). Mason noted that Plaintiff's physical therapy was "progressing fairly well." (Id.). While he was found to be able to flex his left knee thirty (30) degrees, it was also noted that Plaintiff could not get full extension with his left knee. (Id.). Mason recommended that Plaintiff be evaluated by his orthopedic surgeon in order to increase his range of motion, strength exercises, and walking with increased

weight bearing.  (Doc. 57, p. 160).

On May 9, 2012, a physician's assistant noted that Plaintiff's physical therapy was progressing well.  (Id. at p. 80).  The physician assistant also noted that Plaintiff did not have full range of motion nor was he full weight bearing as to his left knee.  (Id.).  It was again recommended that Plaintiff see his orthopedic surgeon for an evaluation.  (Id.).

On June 7, 2012, Plaintiff was sent to University Orthopedics Center for an evaluation with his orthopedic surgeon, Dr. Stauff.  (Id. at pp. 80-82).  It was recommended that Plaintiff begin aggressive AROM, AAROM, and PROM exercises of the left knee, discontinue his use of the knee brace and gait aids, and begin walking in the yard.  (Id.).  Dr. Stauff also recommended that Plaintiff perform physical therapy three (3) times per week for four (4) weeks.  (Id.). Additionally, Plaintiff was instructed to continue "quad strength exercises."  (Id.).

On June 8, 2012, Plaintiff was evaluated by Myranda Martin, PA-C.  (Id. at pp. 116, 157).  Martin reviewed Plaintiff's orthopedic consultation and observed Plaintiff ambulating into the room with a slight antalgic gait favoring right side. (Id.).  It was noted that Plaintiff stated that he was feeling better already walking without crutches, enrolled in physical therapy, and that his orthopedic surgeon recommended aggressive AROM, AAROM, and PROM exercises.  (Id.).  Plaintiff

was also instructed to avoid sports, but he could walk in the yard. (Doc. 57, pp. 116, 157). Further, Plaintiff was ordered to discontinue use of his knee brace and crutches. (Id. at pp. 116, 222).

On June 21, 2012, Plaintiff was evaluated for swelling in his left knee. (Id. at p. 160). On July 13, 2012, Plaintiff was noted as having eighty (80) degree flex and instructed to keep up aggressive stretching. (Id. at p. 158). On August 10, 2012, Plaintiff was evaluated and found to have ninety-one (91) degree flex in his left knee. (Id.).

On August 28, 2012, a telephone call was placed to "Altoona Orthopedics" at Plaintiff's request because he felt he was supposed to have a follow up appointment. (Id. at p. 155). Altoona Orthopedics stated that no follow up was needed, but rather he would be seen on an as needed basis. (Id.).

On August 31, 2012, Plaintiff was evaluated Dr. Teresa Wolff for complaints of pain over his left knee and decreased range of motion. (Id.). Plaintiff was found to have ninety (90) degree flex and one hundred and eighty (180) degree extension in his left knee. (Id.). It was recommended that Plaintiff undergo an orthopedic consultation. (Id.).

On September 7, 2012, Plaintiff was evaluated by R.D. Mason, PT, and found to be able to flex his left knee to one hundred and two (102) degrees. (Id.).

Mason also noted that Plaintiff had been making slow progress, and that a physical therapist had been following up with Plaintiff as to his stretching and strength. (Doc. 57, p. 155). Plaintiff also indicated that he wished to discontinue his physical therapy. (Id.).

On September 21, 2012, D. Schrock, RN, reported that "DC 487 completed for transfer back to SCI GRA on [September 27, 2012]." (Id. at p. 156). Schrock also noted that Plaintiff "was at [SCI-Laurel Highlands] on temp transfer for his knee/[physical therapy]." (Id.).

On September 24, 2012, Plaintiff was evaluated by Dr. Wolff for complaints of left knee pain and a clicking sound emitted by his left knee. (Id.). Plaintiff also reported that his left knee was giving way. (Id.). His flex was found to be one hundred and five (105) degrees. (Id.). Treatment plan was deferred until Plaintiff under went an orthopedic consultation. (Id.).

On September 27, 2012, Plaintiff was evaluated by D. Holland, RN. (Id.). Holland noted that Plaintiff was ambulating without assistance and was found to be "medically stable for transfer to SCI-Huntingdon." (Id.). Plaintiff was transferred back to SCI-Huntingdon and instructed to follow up as needed. (Id. at pp. 18, 156).

On October 1, 2012, Plaintiff was ordered a "MD/PA line in 3 weeks" for

loss of motion in his left knee.  (Doc. 57, p. 116).  On October 3, 2012, Plaintiff

was seen by Dr. Luis Areneda regarding complaints of loss of motion and pain in

his left knee.  (Id. at p. 153).  It was noted that Plaintiff did not want to be

transferred or referred to physical therapy, and that he would do his own exercises.

(Id.)

On October 16, 2012, Plaintiff was seen by Dr. Marty Cole for complaints

of left knee pain and decreased range of motion.  (Id. at pp. 115, 153).  Dr. Cole

ordered an x-ray on Plaintiff's left knee, to "put Pt back NSAIDS," and prescribed

Motrin for his pain.  (Id.).  On November 7, 2012, Plaintiff underwent an x-ray on

his left knee.  (Id. at p. 95).  The x-ray revealed that Plaintiff did not have an acute

fracture or dislocation, his soft tissue was unremarkable, no erosive changes were

seen, and no joint diffusion was found.  (Id.).  The conclusion of the x-ray was that

Plaintiff's left knee was normal.  (Id.).

On November 29, 2012, it was noted that Plaintiff was experiencing

persistent pain and complained of decreased movement in his left knee.  (Id. at p.

78).  Plaintiff also reported that there was frequent clicking in his knee.  (Id.).  An

orthopedic evaluation was requested, which was approved by Dr. Long on

December 3, 2012, and "UR"  on December 5, 2012.  (Id.).

On January 3, 2013, Plaintiff underwent an orthopedic evaluation with Dr.

Hubler at University Orthopedic in Altoona, Pennsylvania. (Doc. 57, pp. 78-79). It was noted that Plaintiff has decreased range of motion and persistent pain in his left knee. (Id. at p. 78). His range of motion was found to be from zero (0) degrees to ninety-five (95) degrees. (Id.). It was also noted that Plaintiff had significant quadriceps atrophy. (Id.). Dr. Hubler recommended that Plaintiff undergo physical therapy three (3) times a week for six (6) to eight (8) weeks, focusing on quadriceps strength and knee range of motion. (Id. at pp. 78-79). A follow up was recommended after eight (8) weeks. (Id.).

On January 15, 2013, Dr. Joseph Migliore referred Plaintiff for a physical therapy consultation. (Id. at p. 77). On January 28, 2013, Defendant Baker approved Plaintiff for two (2) physical therapy consultations. (Id.).

On March, 14, 2013, physical therapist Eugene Zappa noted that Plaintiff had been approved for two (2) physical therapy consultations. (Id.). Zappa also noted that Plaintiff had range of motion from zero (0) to ninety (90) degrees and four (4) out of five (5) strength in his left knee. (Id.). Plaintiff also ambulated with a mild left antalgic gait pattern. (Id.). Zappa instructed Plaintiff on an exercise regimen that he would complete on his own, which included aggressive physical therapy exercises and passive stretching for his left knee. (Id.). Zappa noted that he would follow up with Plaintiff in one (1) month. (Id.).

On April 19, 2013, Plaintiff was evaluated by Michael Gomes, PA-C. (Doc. 57, pp. 74, 152). Gomes noted that Plaintiff's orthopedic specialist requested a follow up after he finished his six (6) weeks of physical therapy, which Plaintiff reported had not helped. (Id.). During the evaluation, Gomes observed that Plaintiff had minimal chronic swelling in his left knee, full extension without pain, and somewhat limited flexion with pain by no effusion noted. (Id. at p. 152). Gomes instructed Plaintiff to continues with exercises and wearing knee brace. (Id.). Plaintiff was given Ibuprofen to take as needed. (Id. at pp. 113, 152). Plaintiff was to follow up at his next physical therapy visit to discuss other exercises, and a new orthopedic consult was written per Plaintiff's request. (Id. at p. 152). On April 22, 2013, Defendant Baker approved Plaintiff's orthopedic consultation, which was conducted on May 15, 2013. (Id. at p. 74).

On April 25, 2013, Plaintiff was seen by Dr. Migliore. (Id. at p. 149). It was noted that there was concern about Plaintiff's range of motion and strength in his left knee. (Id.). Dr. Migliore noted that Plaintiff was to undergo an orthopedic consultation and a physical therapy visit. (Id.).

On May 15, 2013, Plaintiff was seen by physical therapist Eugene Zappa. (Id. at p. 75). Plaintiff reported improvement in his left knees range of motion and strength. (Id.). His left knee was noted as having a range of motion of zero (0) to

14

one hundred (100) degrees and four (4) out of five (5) strength. (Doc. 57, p. 75).

Definition in Plaintiff's quadriceps was noted. (Id.). Plaintiff's leg exercises were

reviewed, and he was instructed to use the stationary bike on the elliptical

machine, and hamstring and quadriceps unit in the gym. (Id.). Plaintiff was also

instructed to continue the exercise regimen he could perform on his own. (Id.).

On that same date, Plaintiff was evaluated by Dr. Hubler at the University

Orthopedics Center. (Id. at p. 74). It was determined by Dr. Hubler that Plaintiff

needed aggressive physical therapy for his left knee. (Id.). Dr. Hubler

recommended that Plaintiff undergo physical therapy two (2) to three (3) times a

week for twelve (12) weeks for his left knee range of motion. (Id.). Dr. Hubler

also recommended that Plaintiff receive an MRI of his left knee, iontophoresis on

the anterior of his left knee with physical therapy, be prescribed Dexamethasone,

and follow up in three (3) months. (Id.).

On May 24, 2013, Plaintiff was evaluated by Michael Gomes, PA-C. (Id. at

pp. 71, 108-10, 150). Plaintiff complained of ongoing left knee pain and pain in

his right knee and the bottom of his right foot due to overcompensation. (Id. at p.

150). Plaintiff also reported that Motrin was not helping, and that standing all day

at work was making his condition worse. (Id.). Gomes switched Plaintiff from

Motrin to Mobic and prohibited Plaintiff from working, activities, sports,

weightlifting, and the yard for ninety (90) days.  (Doc. 57, pp. 109, 150).  Gomes also instructed Plaintiff to avoid squatting and prolonged standing.  (Id. at p. 109).  Plaintiff was also referred for a physical therapy evaluation, an MRI on his left knee, and given a PA line in one (1) month to recheck his left knee.  (Id. at p. 108).

On May 28, 2013, Gomes evaluated Plaintiff, who requested removal from complete lay-in.  (Id. at p. 147).  Plaintiff reported that Mobic was working better than Motrin to alleviate his knee pain.  (Id.).  Plaintiff also requested a new knee brace for his left knee.  (Id.).  Gomes issued a left hinged knee brace to Plaintiff.  (Id. at p. 107).  Gomes also prohibited Plaintiff from sports, squatting, and prolonged standing.  (Id. at p. 108).

On June 14, 2013, Plaintiff underwent an MRI on his left knee.  (Id. at pp. 72-73).  The MRI results found "[p]ost surgical changes with thickening of quadriceps and patellar tendons and postsurgical change within the patella."  (Id. at p. 73).  The MRI also found "[n]o evidence of recurrent rupture or tear," "[s]uperior patellar enthesophyte," "[m]ild edema overlying the medial retinaculum," and "[l]ateral retinaculum is intact."  (Id.).  Plaintiff's "ACL, PCL, and LCL" were "normal in appearance," and his "[m]edial and lateral meniscus" were "normal."  (Id.).  The MRI also found "[s]mall joint effusion," "[p]artial thickness chondral medial patellar facet," and "[n]o evidence of fracture."  (Id.).

Further, Plaintiff's "[v]isualized pes anserine tendons and popliteus tendon are normal in signal." (Doc. 57, p. 73).

On June 24, 2013, Plaintiff attended his physical therapy referral at Health South. (Id. at p. 71). Plaintiff was instructed as to his exercises and ordered to perform progressive exercises for range of motion and strength. (Id.). Plaintiff was also ordered to undergo iontophonesis and to be given Dexamethasone. (Id.).

On July 5, 2013, Plaintiff was seen by Michale Gomes, PA-C, and requested the results of his June 14, 2013, MRI of his left knee. (Id. at p. 148). Gomes noted that the "[n]ew MRI shows post-op scar tissue, patellar bone spur, mild edema, and a 'partial thickness chondral defect of the medial patellar facet.'" (Id.). It was also reported that Plaintiff had chronic left knee pain. (Id.). Gomes ordered Plaintiff an "MD line next week to discuss results of recent left knee MRI in more detail." (Id. at p. 105).

On July 9, 2013, Plaintiff was seen by Dr. Tavares due to complaints of bilateral knee pain. (Id. at p. 145). Dr. Taveres also reviewed with Plaintiff the results of his June 14, 2013, MRI. (Id.). Plaintiff was ordered to undergo a "PT exam" and be given a brace. (Id. at pp. 105, 145).

On July 16, 2013, Plaintiff was evaluated for knee pain and plantar fasciitis. (Id. at pp. 70, 105, 145). It was noted that Plaintiff's treatment to date and current

medications included "exercises" and "NSAIDS." (Doc. 57, p. 70). On July 20, 2013, Plaintiff was given a stabilized knee brace. (Id. at p. 221). On July 23, 2013, his physical therapy consultation was approved. (Id. at pp. 70, 146).

On August 7, 2013, Plaintiff underwent an x-ray on his right foot. (Id. at pp. 93-94). On that same date, he was also evaluated by Mark McConnell, PA-C for left knee and right foot complaints. (Id. at p. 146). McConnell found, inter alia, Plaintiff's left knee to have a flex of negative five (-5) to ninety-five (95) degrees. (Id.).

On August 13, 2013, Plaintiff was seen by physical therapist Eugene Zappa. (Id. at p. 70). Plaintiff reported bilateral knee pain and right ankle pain. (Id.). Plaintiff's left knee was found to have a range of motion from negative three (-3) to ninety-five (95) degrees and a strength of five (5) of five (5). (Id.). Definition over left quadriceps was noted. (Id.). Plaintiff was instructed to continue aggressive range of motion exercises and follow up in two (2) to three (3) months. (Id.).

On August 16, 2013, Plaintiff was seen by Dr. Tavares. (Id. at p. 143). Dr. Taveres reviewed the results from Plaintiff's x-ray of his right foot. (Id.). No fractures were found, but he was diagnosed with plantar fasciitis. (Id.). It was noted that the "Aleve works well," and he was instructed to "Do Daily Bottle

exercises." (Doc. 57, p. 143).

On August 20, 2013, Dr. Fisher approved Plaintiff for a physical therapy follow up, which was completed on November 12, 2013. (Id. at p. 69).

On August 21, 2015, Plaintiff was seen by Michael Gomes, PA-C "[o]n PA line for x-ray review." (Id. at pp. 143-44). Gomes found that there "appears to be a bone spur on [Plaintiff's] right ankle but otherwise foot x-ray was NCS." (Id.). Gomes noted that the "Aleve is helping a little but [Plaintiff] continues to deal with pain in knees and right foot." (Id. at p. 143). Gomes stated that he would inquire "about labs for inflammatory arthritis, as well as possibly receiving arch supports and/or splint." (Id.). Gomes ordered "CBC, sed rate, ANA, and rheumatoid factor next week," and a "PA line in 3 weeks for lab review." (Id. at p. 104). Plaintiff was also instructed to continue with "Aleve and look for insoles off commissary." (Id. at p. 145). Gomes also noted that if Plaintiff did not experience relief then he would "consider ordering arch supports." (Id.).

On August 22, 2013, Plaintiff was seen by Dr. Tavares. (Id. at p. 141). Plaintiff reported that he was "better," but still had "knee pain." (Id.).

On September 11, 2013, Plaintiff was given a "PA line" for September 20, 2013. (Id. at p. 103). On October 12, 2013, Plaintiff's medial record indicates that "[p]lease place MD line for possible ortho [follow up] consult." (Id.).

On November 12, 2013, Plaintiff had a physical therapy consultation with physical therapist Eugene Zappa. (Doc. 57, p. 69). Zappa noted that Plaintiff was still complaining of left knee pain and decrease range of motion. (Id.). Zappa also reported that Plaintiff "[h]as been followed numerous times by PT post op." (Id.). Zappa then "[e]ncouraged [Plaintiff] to complete exercise program independently." (Id.). Zappa also expressed that he was "[n]ot sure [Plaintiff has] completed" the "exercise program." (Id.). Zappa then "[r]e-instructed [Plaintinff] in aggressive" exercise program, and ordered Plaintiff to use the "stationary bike in gym." (Id.).

## III.  DISCUSSION

A plaintiff, in order to state an actionable civil rights claim, must show (1) that the conduct complained of was committed by a person acting under color of law, and (2) that said conduct deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States. Groman v. Twp. of Manalapan, 47 F.3d 628, 638 (3d Cir. 1995); Shaw by Strain v. Strackhouse, 920 F.2d 1135, 1141-42 (3d Cir. 1990). Further, a civil rights action pursuant to 42 U.S.C. § 1983 cannot impose liability absent personal involvement in the alleged actions. Jordan v. Cicchi, 2015 U.S. App. LEXIS 10489, at *7 (3d Cir. June 22, 2015) (per curiam) (citing Rizzo v. Goode, 423 U.S. 362, 375-77

(1976); <u>Chinchello v. Fenton</u>, 805 F.2d 126, 133-34 (3d Cir. 1986)).  The United

States Court of Appeals for the Third Circuit has stated that

> [P]ersonal involvement can be shown through allegations of
> personal direction or of actual knowledge and acquiescence.
> Allegation of participation or actual knowledge and
> acquiescence, however, must be made with appropriate
> particularity.

<u>Rode v. Dellarciprete</u>, 845 F.2d 1195, 1207 (3d Cir. 1988).

A prison official's medical treatment of a prisoner, or lack thereof, will only

give rise to a constitutional violation where: (1) the prisoner is suffering from "a

serious medical need;" and (2) the prison official's acts or omissions demonstrate

"deliberate indifference" to that need.  <u>See</u> <u>Montgomery v. Pinchak</u>, 294 F.3d 494,

499 (3d Cir. 2002).  Acts of negligence or medical malpractice, without more, are

insufficient to support a constitutional violation.  <u>Estelle v. Gamble</u>, 429 U.S. 97,

106 (1976).  However, the fact that a prison official provides an inmate with some

form of medical treatment does not necessarily absolve the official of liability

under the Eighth Amendment.  <u>See</u> <u>Durmer v. O'Carroll</u>, 991 F.2d 64, 69 (3d Cir.

1993).  Rather, a prison official acts with deliberate indifference if he or she

"knows of and disregards an excessive risk to inmate health and safety."  <u>Natale v.

Camden Cnty. Corr. Facility</u>, 318 F.3d 575, 582 (3d Cir. 2003) (quoting <u>Farmer v.

Brennan</u>, 511 U.S. 825, 837 (1994)).  This is a subjective standard of liability,

consistent with "recklessness as the term is defined in criminal law." Nicci v. Morra, 212 F.3d 798, 811 (3d Cir. 2000). It is insufficient for the official to merely be "aware of facts from which the inference can be drawn that a substantial risk of serious harm exists." Farmer, 511 U.S. at 837.

The United States Court of Appeals for the Third Circuit has recognized that deliberate indifference may exist in a variety of circumstances, including where a prison official: (1) denies a prisoner's reasonable request for treatment, and "such denial exposes [him or her] 'to undue suffering or the threat of tangible residual injury,'" Spruill v. Gillis, 372 F.3d 218, 235 (3d Cir. 2004) (quoting Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro, 834 F.2d 326, 346 (3d Cir. 1987)); (2) knows of a prisoner's need for treatment but refuses to provide it, Durmer, 991 F.2d at 67-69; (3) delays necessary medical treatment for non-medical reasons; (4) prevents a prisoner from receiving needed or recommended medical care; or (5) persists in a course of treatment which results in continued pain and the risk of permanent injury. See Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999) (collecting cases).

A mere difference of opinion between the prison's medical staff and the inmate regarding the diagnosis or treatment which the inmate receives does not support a claim of cruel and unusual punishment. Farmer v. Carlson, 685 F. Supp.

1335, 1339 (M.D. Pa. 1988); see McCracken v. Jones, 562 F.2d 22, 24 (10th Cir. 1977); Smart v. Villar, 547 F.2d 112, 113 (10th Cir. 1976). Moreover, if there is a dispute over the adequacy of the received treatment, courts have consistently been reluctant to second guess the medical judgment of the attending physician. Little v. Lycoming Cnty., 912 F. Supp. 809, 815 (M.D. Pa.), aff'd, 101 F.3d 691 (3d Cir. 1996). The key question is whether the defendant has provided the plaintiff with some type of treatment, regardless of whether it is what the plaintiff desires. Carlson, 685 F. Supp. at 1339.

Furthermore, "a prison administrator who delegates medical care decisions to medical professionals does not have the requisite subjective intent to harm the plaintiff or consciousness of a risk of serious harm." Albert v. Yost, 431 F. App'x 76, 81 (3d Cir. 2011) (per curiam) (citing Spruill, 372 F.3d at 236).

Plaintiff claims that Defendants Baker and Parkes were deliberately indifferent by "refusing to carry out the specialist's recommendations, and refusing to carry out and ignoring the medical orders by the outside specialists" (Doc. 17, pp. 16-17). Defendants Baker and Parkes argue that they are entitled to judgment as a matter of law because (1) Plaintiff's claim involves a mere disagreement with the treatment decisions made by his treating providers; and (2) there is no evidence that Defendants Baker and Parkes were personally involved in

Plaintiff's treatment.  (Doc. 58, pp. 11-16).

## A.  **Defendant Baker**

As to Defendant Baker, assuming, without deciding, that he has sufficient personal involvement in Plaintiff's claim of deliberate indifference, he is still entitled to summary judgment.  A review of Plaintiff's relevant medical records reveals that Defendant Baker is identified as the "State Medical Director" who approved Plaintiff for consultations on two occasions.  (Doc. 57, pp. 74, 77).

The first instance arose from Plaintiff's January 3, 2013, consultation with Dr. Hubler, at the University Orthopedics Center.  (Id. at p. 78).  Dr. Hubler recommended that Plaintiff perform physical therapy three (3) times a week for six (6) to eight (8) weeks.  (Id. at p. 77).  On January 28, 2013, upon referral from Dr. Joseph Migliore, Defendant Baker approved Plaintiff for two (2) physical therapy visits. (Id.).

Plaintiff's first physical therapy visit occurred with physical therapist Eugene Zappa on March 14, 2013.  (Id.).  During this consultation, Zappa instructed Plaintiff in aggressive physical therapy exercises and a passive stretching for Plaintiff's left knee that he would complete on his own two (2) to three (3) times a day.  (Id.).  Zappa noted that he would follow up with Plaintiff in one (1) month.  (Id.).

On May 15, 2013, Zappa re-evaluated Plaintiff and reviewed all leg exercises with him. (Doc. 57, p. 75). Zappa also ordered Plaintiff to use a stationary bike on the elliptical machine, the hamstring and quadriceps unit in the gym, and continue his exercise program. (Id.).

The second instance where Defendant Baker approved Plaintiff's consultation arose from Plaintiff's April 19, 2013, evaluation with Michael Gomes, PA-C. (Id. at p. 74). According to Gomes, Plaintiff's orthopedic specialist requested a follow up after six (6) weeks of physical therapy. (Id.). Gomes also noted that Plaintiff reported that his physical therapy had not helped. (Id.). On April 22, 2013, Defendant Baker approved Plaintiff for a consultation with his orthopedic specialist. (Id.). On May 15, 2013, as a result of Defendant Baker's approval, Plaintiff was evaluated by Dr. Hubler at University Orthopedics Center and provided with a new physical therapy regimen. (Id.).

While Plaintiff's medical records reflect that there were specific recommendations by his orthopedic specialist, Dr. Hubler, that Plaintiff undergo physical therapy, it also reflects that Defendant Baker's actions were not deliberately indifferent to Plaintiff's medical needs. Specifically, in response to Dr. Hubler's recommendation that Plaintiff perform physical therapy three (3) times a week for six (6) to eight (8) weeks, Defendant Baker approved Plaintiff for

two physical therapy consultations on January 28, 2013. (Doc. 57, p. 77). As a result of Defendant Baker's approval, physical therapist Eugene Zappa performed a physical therapy consultation with Plaintiff on March 14, 2013. (Id.). On that date, Zappa instructed Plaintiff in "aggressive" physical therapy exercises and stretches "to be completed by" Plaintiff two (2) to three (3) times a day. (Id.). Zappa then followed up with Plaintiff on May 15, 2013. (Id. at p. 75). In addition to evaluating Plaintiff, Zappa also reviewed all leg exercises, and instructed Plaintiff to use the stationary bike on the elliptical machine, hamstring and quadriceps unit in the gym, and continue his exercise program. (Id.).

At most, Defendant Baker was negligent in not approving Plaintiff for more than two (2) physical therapy consultations, both of which resulted in Plaintiff being instructed on exercises and stretches he could perform on his own. (Id. at pp. 75, 77). Negligence, however, does not rise to the level of a constitutional violation. See White v. Napoleon, 897 F.2d 103, 108 (3d Cir. 1990) ("Mere medical malpractice cannot give rise to a violation of the Eighth Amendment."); Stones v. McDonald, 7 F. Supp. 3d 422, 434 (D. Del.) (finding that medical defendants were, at most, negligent for giving plaintiff exercises to perform as opposed to the recommended course of treatment that plaintiff undergo outside physical therapy), aff'd, 573 F. App'x 236 (3d Cir. 2014); see also Pierce v.

Pitkins, 520 F. App'x 64, 66 (3d Cir. 2013) (The plaintiff's "disagreement with the method of physical therapy he received is not sufficient to establish a constitutional claim.") (citing Lanzaro, 834 F.2d at 346).

Furthermore, in light of the other medical care provided to Plaintiff as a result of Defendant Baker's April 22, 2013, approval, no reasonable jury could find that Defendant Baker was deliberately indifferent to Plaintiff's medical needs. Specifically, Defendant Baker approved another orthopedic consultation for Plaintiff after he reported that the six (6) weeks of physical therapy had not helped. (Doc. 57, p. 74). On May 15, 2013, as a result of Defendant Baker's April 22, 2013, approval, Plaintiff was seen by Dr. Hubler, an orthopedic specialist at University Orthopedics Center. (Id.). Dr. Hubler recommended that Plaintiff undergo aggressive physical therapy for his left knee's range of motion two (2) to three (3) times a week for twelve (12) weeks. (Id.). Dr. Hubler also recommended that Plaintiff receive an MRI on his left knee, iontophonesis on the anterior of his left knee, Dexamethasone, and follow up in three (3) months. (Id.). On June 14, 2013, Plaintiff underwent an MRI on his left knee. (Id. at pp. 72-73).

Moreover, Plaintiff has declared under penalty of perjury that "the prison doctor at the time, Dr. Araneda," told him "that the only person [he] had to take to court was" Defendant Baker. (Doc. 60, p. 4). According to Plaintiff, Dr. Araneda

"gave [him] [Defendant] Baker's name, title, and address." (Doc. 60, p. 4).

Plaintiff also declares under penalty of perjury that he "had no idea of who [Defendant] Baker was before Dr. Araneda told [him] who [Defendant] Baker was." (Id.). In his declaration in opposition to Defendants' reply brief, Plaintiff declares that he

> has sued Mark Baker because the prison doctor at Huntingdon at the time told Plaintiff that Mark Baker is the person that determines the kind of treatment the plaintiff received. Mark Baker was the person trying to save the money by not sending Plaintiff to his appointments, not letting plaintiff get the surgery he needs, and only having the Plaintiff see a guy for about five minutes to do therapy once every few months, when he knew that the outside doctors said [Plaintiff] needed "aggressive" physical therapy, with a real physical therapist at least three days a week.

(Doc. 63, p. 4). Even taking these assertions and drawing all inferences in the light most favorable to the Plaintiff, as stated above, Defendant Baker was, at most, negligent. However, acts of negligence or medical malpractice, without more, are insufficient to support a constitutional violation. See Estelle, 429 U.S. at 106; see also Stones, 7 F. Supp. 3d at 434 (D. Del.) (finding that medical defendants were, at most, negligent for giving plaintiff exercises to perform as opposed to the recommended course of treatment that plaintiff undergo outside physical therapy), aff'd, 573 F. App'x 236.

As a result of the foregoing, Defendants motion for summary judgment as to Defendant Baker will be granted.

## B.    <u>Defendant Parkes</u>

Unlike Defendant Baker, Plaintiff's medical records do not establish that Defendant Parkes had a role in the relevant treatment regarding Plaintiff's deliberate indifference claim.  <u>See</u> (Doc. 57, pp. 15-230).  Rather, in the materials of record, Defendant Parkes' only documented action was in regards to Plaintiff's June 26, 2013, inmate request to obtain his knee brace and "foot cup."  (Doc. 17, p. 35).  On June 27, 2013, Defendant Parkes, who identified herself as a Health Services Administrator for Wexford Healthcare at SCI-Huntingdon, responded to Plaintiff's request.  (<u>Id.</u>).  Defendant Parkes stated in response that she would check into "the issue with the knee brace," and instructed Plaintiff to "sign up for sick call to get" his foot cup ordered.  (<u>Id.</u>).

In his declaration in opposition to Defendants' reply brief, Plaintiff declares under penalty of perjury that he sued Defendant Parkes

> because she's the healthcare administrator at Huntingdon, and she has told the Plaintiff and made the Plaintiff do the physical therapy by himself, although she knows that the Plaintiff's condition is so bad that the outside orthopedic surgeon, Dr. Hubler, and Dr. Stauff too, said that Plaintiff cannot do the physical therapy by himself and get the results that he needs.

(Doc. 63, p. 4).  However, a review of the materials of record does not support Plaintiff's contention.  <u>See</u> (Doc. 57, pp. 15-230).  Rather, the summary judgment record supports a finding that Defendant Parkes lacked the requisite personal involvement in Plaintiff's deliberate indifference claim.

Therefore, based on the above discussion, Defendants' motion for summary judgment as to Defendant Parkes will be granted.

IV.    **<u>CONCLUSION</u>**

As a result of the foregoing, Defendants' motion for summary judgment will be granted.  Judgment will be entered in favor of Defendants Baker and Parkes.

A separate Order will be issued.


Date: October 9, 2015                              /s/ William J. Nealon
                                                   **United States District Judge**